Filed 3/5/21

**CERTIFIED FOR PARTIAL PUBLICATION\***

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

|  |  |
|---|---|
| THOMAS R. SARGENT,<br><br>     Plaintiff and Respondent,<br><br>v.<br><br>BOARD OF TRUSTEES OF THE CALIFORNIA STATE UNIVERSITY et al.,<br><br>     Defendants and Appellants. | A153072, A154926<br><br>(Sonoma County<br>Super. Ct. No. SCV-255399) |

Respondent Thomas Sargent is a health-and-safety technician at Sonoma State University (SSU or the University), which is part of the California State University (CSU) system. He sued CSU and his supervisor Craig Dawson (appellants) for the way he was treated after raising environmental concerns at the University. A jury found in his favor on claims alleging unlawful retaliation and on a claim under the Labor Code Private Attorneys General Act of 2004 (Labor Code, § 2698 et seq., PAGA), which was premised almost entirely on violations of the California Occupational Safety and Health Act of 1973 (Labor Code, § 6300 et seq., Cal-OSHA). Among other relief, he was awarded more than $2.9 million in PAGA penalties and more than $7.8 million in attorney fees. These consolidated appeals are from the judgment (A153072) and the award of fees (A154926).

---

\* Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts II B and II C.

1

Appellants offer several theories in arguing that CSU is not subject to PAGA as a matter of law, but we are not persuaded by them. We first reject their theory that Education Code section 66606.2 bars PAGA claims against CSU. We then reject their theory that CSU is categorically immune from PAGA penalties because it is a public entity. On this point, we hold that viable PAGA claims can be asserted against CSU, but only when the statutes upon which the claims are premised themselves provide for penalties. Here, Sargent brought some viable PAGA claims, but he ultimately failed to establish CSU's liability for them because the jury found that he was not personally affected by the underlying statutory violations. Thus, we reverse the award of PAGA penalties.

In the unpublished portion of our opinion, we conclude that the trial court did not err in precluding certain evidence offered to defend Sargent's retaliation claims, and we affirm the trial court's award of attorney fees.

I.
FACTUAL AND PROCEDURAL
BACKGROUND

Sargent began working for the University in February 1991 as an environmental health-and-safety technician. SSU's environmental health-and-safety office is responsible for the University's asbestos management program, and Sargent was the campus's licensed asbestos consultant.

Sargent presented abundant evidence at trial, most of which is not challenged on appeal, about how he was treated after raising concerns about environmental hazards at SSU. The evidence focused primarily on how he was treated after raising two concerns: the first was about an incident in which lead paint chips were dispersed with a leaf blower near an entrance to a campus building, and the second was about the presence of asbestos in a different campus building.

2

The leaf-blower incident occurred in summer 2012, when the University was planning to clean a roof. Some of the paint on the roof was loose and flakey, and the gutters were filled with debris. Sargent conducted tests that revealed lead in the paint, and he told Dawson about the results. After receiving bids from a company to remove or stabilize the loose paint and to clean the debris, Dawson decided to clean the gutters in-house to save money. When Sargent learned that the University's plan was to remove the debris with a leaf blower, he told Dawson that the scheme might violate safety regulations, but Dawson countered that Sargent was "going to kill the projects with cost."

The University went ahead with its plan, and some of the blown debris landed around the entryway to the building. An employee in the building asked Sargent to have it cleaned up. Sargent warned the employee that the debris came from an area with lead and to stay out of the area while he retrieved tools to test the debris. By the time Sargent returned, the debris had been blown away from the entryway, down the entryway stairs, and into surrounding ivy and rocks. Sargent collected samples, and testing revealed that the debris contained 7,200 milligrams of lead per kilogram, or more than seven times what is considered to be hazardous waste.

Sargent notified three government agencies about the incident. Dawson told Sargent that he was not "in any way authorized to contact regulatory agencies on this issue," and he directed Sargent to inform him if an agency responded. Dawson also told him not to share health and safety information with coworkers.

Sargent nonetheless sent an email about the incident to various people at SSU. An employee union filed a grievance after some of its members expressed concern that the incident may have improperly exposed them and

children in a day camp program to lead. After receiving Sargent's complaints about the incident, the Division of Occupational Safety and Health (DOSH)[1] issued citations and a notice of penalty. The Department of Emergency Services also issued a citation.

After the leaf-blowing incident, Sargent was disciplined and placed on a performance-improvement plan. He thereafter received the lowest performance ratings that Dawson ever gave him, and he was excluded from meetings about abatement projects with third-party consultants.

Separate from the leaf-blowing incident, the evidence at trial also focused on how Sargent was treated after he raised concerns about asbestos in Stevenson Hall, a campus building that houses more than 100 offices, some occupied by multiple people.

In spring 2013, Sargent collected a dust sample from a windowsill in the building, and testing showed there was enough asbestos to contaminate 18,000 square feet. Around this time, Dawson restricted Sargent from asbestos-related work. For the previous 22 years, Sargent had tested for asbestos whenever he considered it to be appropriate, but Dawson began requiring Sargent to ask for Dawson's approval before performing such tests, and Dawson sometimes denied the requests.[2]

At one point, Dawson, his supervisor (the associate vice president for facilities, operations, and finance), the president of the University, and

---

[1] Although trial witnesses sometimes referred to this agency as "Cal OSHA," as it is commonly known, the division is formally known as the Division of Occupational Safety and Health, or DOSH. (2 Chin et al., Cal. Practice Guide: Employment Litigation (The Rutter Group 2019) ¶ 13:16, p. 13-3.)

[2] As part of this litigation, the parties in spring 2016 collected dust samples at Stevenson Hall for testing. In one office, test results showed 28,000 asbestos fibers per square centimeter.

4

another University official met to discuss asbestos. The vice president was troubled when he learned that Dawson had required Sargent to obtain approval before notifying outside agencies of environmental issues. Dawson explained that he had asked Sargent to speak with him first so that there were "some protocols in place" if Sargent was representing the University. Sargent received six written reprimands in the three months after raising concerns about asbestos at Stevenson Hall.

Sargent initiated these proceedings in May 2014. His third amended complaint alleged five retaliation causes of action under various statutes (Gov. Code, § 8547 et seq. [California Whistleblower Protection Act]; Lab. Code, §§ 1102.5, 6310, 6399.7, 232.5),[3] four causes of action under the California Fair Employment and Housing Act (FEHA, Gov. Code, § 12900 et seq.), and one cause of action for civil penalties under PAGA. The PAGA cause of action was premised on allegations that CSU had violated various provisions of Cal-OSHA (§§ 6311, 6400, 6401, 6401.7, 6402, 6403, 6404, 6406).

After the lawsuit was filed, Dawson maintained that Sargent was not timely completing all his assigned tasks. He started requiring Sargent to document his time using a "time utilization audit." According to Dawson, the purpose was to determine whether Sargent had administrative tasks that could be reassigned to student assistants or others. At first, Dawson required Sargent to document his time in two-hour increments, but he later changed it to 15-minute increments and required Sargent to provide more detail to account for his time. Sargent's union representative learned that no other SSU employee had ever been subject to such a time-accounting requirement.

---

[3] All further statutory references are to the Labor Code unless otherwise specified.

5

In September 2014 Sargent filed a PAGA notice to the Labor and Workforce Development Agency to report Labor Code violations at SSU, and served a copy on the University. The following month, the University delivered Sargent notice of a pending 10-day suspension, which took effect in November.

Environmental concerns continued to arise. In late 2014 or early 2015, Sargent heard that Dawson had directed two people from the facilities department to "dry sweep" lead from a roof. Sargent already had felt "beleaguered" since the leaf-blowing incident, and he told a coworker, "I really can't do this. They're coming to me again to do the stuff, which I've done a lot of. And I just said, I can't do it. Somebody else in the union has to help you guys with these health and safety issues, because I've been defeated at every turn." He felt "frazzled" and found it hard to concentrate on his work, and he "was literally sinking every step of the way, one burden after another, and that was it," he "couldn't take it."

In early 2015, Sargent also learned that the University planned to renovate the provost's office, which would involve demolishing its ceiling. He was concerned that the ceiling might contain asbestos, but Dawson said there was no plan to conduct any dust testing. After raising his concerns, Sargent was placed on a four-week suspension. He subsequently was able to test the ceiling in the provost's office and found that the level of asbestos was high enough that, in his professional opinion, demolishing the ceiling without first cleaning the dust "would have liberated all of that accumulated dust into the ventilation system, and it would have gone into everybody's office."

Sargent resigned in June 2015 because, in his words, "I literally couldn't take it anymore. I wasn't sleeping. I wasn't getting anywhere with

6

the health and safety stuff.  They didn't want me there.  [Dawson] wanted to fire me.  It was the end."

A jury trial began in January 2017.  Sargent testified and offered his opinion about SSU's noncompliance with various regulations.  Appellants presented the testimony of an expert who opined that the leaf-blowing incident did not create an unsafe condition, and that employees in Stevenson Hall exposed to asbestos-containing materials faced a de minimis risk of developing asbestosis.  Another expert testified that Stevenson Hall was "a safe and healthy work environment."  And yet another defense expert testified about the reasonableness of Sargent's efforts to find a new job after leaving SSU.

The jury returned special verdicts in favor of Sargent and against CSU and Dawson.  As summarized in the judgment, the jury found in Sargent's favor on three retaliation causes of action, those brought under sections 1102.5, 6310, and 232.5, subdivision (c).  The jury also found in Sargent's favor on the PAGA claim based on a violation of section 232.5, subdivision (a)—which prohibits an employer from requiring an employee as a condition of employment to refrain from disclosing information about the employer's working conditions—and violations of various Cal-OSHA statutory and regulatory provisions.  Jurors found that CSU had failed to take certain actions to protect employees' health and safety in Stevenson Hall in violation of sections 6401 and 6403; failed to establish, implement, or maintain an effective injury-prevention program in Stevenson Hall (§ 6401.7, subd. (a)); violated various regulations regarding asbestos-containing waste, debris, and other materials in Stevenson Hall (Cal. Code Regs., tit. 8, §§ 1529, subd. (*l*)(3), 5208, subds. (k)(1) & (k)(7)); and either failed to inspect the HVAC system in Stevenson Hall as required or failed to correct

7

any problems in a reasonable time (*id.*, § 5142, subd. (b)(1)). Jurors found that the various Cal-OSHA violations affected up to 231 CSU employees, but not Sargent.

The trial court reserved the issues of Sargent's requests for equitable relief as well as determination of PAGA penalties. The court ultimately ordered Sargent to be reinstated, ordered his negative personnel records to be expunged, and awarded him back pay and benefits.[4] As for the PAGA penalties, the court ordered CSU to pay $100 in "initial violation" civil penalties for its violation of section 232.5 (§ 2699, subd. (f)); $2,004,200 for violations of section 6407; and $900,900 for violations of sections 6401, 6403, and 6401.7, subdivision (a). Total civil penalties against CSU thus were $2,905,200.

CSU and Dawson timely appealed from the judgment (A153072).

Meanwhile in the trial court, Sargent sought his attorney fees. He asked for more than $11.5 million in fees: around $3.9 million, times a 3.0 multiplier for three of the five attorneys for whom fees were sought. In a detailed order spanning 29 pages, the trial court concluded that a 2.0 multiplier for three of Sargent's attorneys was appropriate, and awarded a total of $7,793,030 in attorney fees. CSU and Dawson timely appealed from the award of attorney fees (A154926).

After briefing was complete in both A153072 and A154926, the court consolidated the appeals on its own motion.

---

[4] The jury awarded Sargent $271,895 in past and future economic damages, but he elected the equitable remedy of reinstatement in lieu of those damages. The jury also awarded Sargent $116,000 in noneconomic damages, which were included in the judgment. Other than their claim that appellants are entitled to a new trial because the court allegedly abused its discretion in excluding certain defense testimony, appellants do not challenge the jury's determinations, or the relief awarded, on the retaliation claims.

8

## II.
## Discussion

*A. Aggrieved Public Employees Can Bring Certain PAGA Claims Against Their Employers, but Sargent Failed to Prove any Such Claim Against CSU.*

   1. Education Code section 66606.2 Does Not Exempt CSU from Suit Under PAGA.

Appellants first argue that the Education Code precludes application of PAGA to CSU.  The argument is based on the California State University Management Efficiency Act of 1996.  (Historical and Statutory Notes, 28 Pt. 3 West's Ann. Ed. Code (2012 ed.) foll. § 66606.2, p. 399.)  Under the act, "it is the intent of the Legislature that both of the following occur:  [¶] (a) Before legislation that, by its terms, applies to the state or its agencies, departments, or boards, may apply to the California State University, the legislation should be compatible with the mission and functions of the California State University.  [¶] (b) The California State University not be governed by any statute enacted after January 1, 1997, that does not amend a previously applicable act and that applies generally to the state or to state agencies, departments, or boards, unless the statute expressly provides that the California State University is to be governed by that statute."  (Ed. Code, § 66606.2.)  CSU reasons that PAGA does not apply to it because PAGA was enacted after 1997 but does not "expressly provide[] that the California State University is to be governed by that statute."  (Ed. Code, § 66606.2, subd. (b).)

CSU's interpretation of section 66606.2 is far too expansive.  In enacting the statute, the legislature was "[r]ecognizing the unique mission and functions of [CSU] among the departments, agencies, and boards of the state."  (Ed. Code, § 66606.2.)  By its terms, section 66606.2 applies only to statutes "that appl[y] generally to *the state or to state agencies, departments,*

9

*or boards*." (*Id.*, subd. (b), italics added.) This language evinces a legislative intent for CSU, because of its unique mission and functions, to be excluded from future statutes directed to the state or state agencies, unless the statutes expressly provided otherwise. It cannot reasonably be read, however, to suggest a legislative intent for CSU to be exempt from all laws of general application unless they expressly include CSU.

Our reading of the statute is consistent with its legislative history. As part of the legislation that enacted Education Code section 66606.2, the Legislature also amended Government Code section 11000, which defines state agencies. (Stats. 1996, ch. 938, § 7.) That statute defines a "state agency" as "every state office, officer, department, division, bureau, board, and commission." (Gov. Code, § 11000, subd. (a).) The 1996 amendment provides that "[a]s used in any section of this title that is added or amended effective on or after January 1, 1997, 'state agency' does not include the California State University unless the section explicitly provides that it applies to the university." An Assembly bill analysis, which was judicially noticed by the trial court, noted that the Legislature already had created an independent governing board for CSU (Ed. Code, § 66606), instituted a separate authority to construct the physical plant at CSU campuses (*ibid.*), and provided for a separate appointment authority for its employees (*id.*, § 66609). (Assem. Com. on Higher Ed., analysis of Assem. Bill 3132 (1995-1996 Reg. Sess.) p. 2.) Despite the legislative intent to make CSU independent, it would be "swept within the confines" of statutes and "become[] enmeshed in a wide array of legislation that *applies generally to all state agencies*." (*Ibid.*, italics added.) Taken together, the amended Government Code statute and new Education Code statute ensured that California State University would not be considered a "state agency" for

10

purposes of newly enacted statutes. These statutes do not, however, provide a blanket "exempt[ion for] CSU from all statutes enacted after January 1, 1997," as appellants argue.

Despite appellants' insistence of the sweeping effect of Education Code section 66606.2, the statute has not been applied to a single piece of legislation since its enactment more than 20 years ago. So far as we are aware, it has been cited in only one appellate opinion, as dicta in a footnote. (*Sheppard v. North Orange County Regional Occupational Program* (2010) 191 Cal.App.4th 289, 310, fn. 13 [in analyzing Legislature's authority over public-school districts, court noted Legislature would be limited by Ed. Code, § 66606.2 when governing CSU].) It appears that even CSU's trial counsel was not initially aware of the statute. Our record suggests that CSU did not cite the statute until more than a year after the initial complaint was filed in connection with the demurrer to Sargent's third amended complaint. And even then, CSU did not cite the statute when it first filed the demurrer in December 2015 or at the hearing on that motion, but waited until it filed post-hearing supplemental briefing.[5]

We conclude that Education Code section 66606.2 clarifies the Legislature's intent to exempt CSU from new laws directed to state agencies, not to exempt it from all generally applicable new laws. Because PAGA is not a statute that is directed to state agencies, we hold that section 66606.2 does not exempt CSU from its application.

---

[5] The trial court overruled the demurrer and denied a related motion to strike but did not specifically address the Education Code. CSU and Dawson sought review in this court by way of a petition for a writ of mandamus, which this court denied. (*Board of Trustees of the California State University v. Superior Court* (July 19, 2016, A148570, petn. den. [nonpub. order]).)

## 2. PAGA Permits Employees to Pursue Some, but Not All, Labor Code Violations Against CSU.

We next turn to the more difficult question of whether Sargent could maintain his PAGA claims against CSU. As we shall explain, CSU is not categorically immune from PAGA claims on the basis that it is a public entity. Viable PAGA claims can be maintained against public entity employers, including CSU, but only when the laws upon which the claims are premised themselves provide for penalties. PAGA claims cannot be maintained against public entities when the laws upon which the claims are premised do not themselves provide for penalties. This is because public entities are not "persons" under PAGA allowed to bring such claims. Here, even though Sargent brought some viable PAGA claims against CSU, he failed to establish CSU's liability for them because the jury found that he was not personally affected by the statutory violations underlying these claims.

### a. Statutory Background.

In enacting PAGA, "[t]he Legislature declared that adequate financing of labor law enforcement was necessary to achieve maximum compliance with state labor laws, that staffing levels for labor law enforcement agencies had declined and were unlikely to keep pace with the future growth of the labor market, and that it was therefore in the public interest to allow aggrieved employees, acting as private attorneys general, to recover civil penalties for Labor Code violations, with the understanding that labor law enforcement agencies were to retain primacy over private enforcement efforts." (*Arias v. Superior Court* (2009) 46 Cal.4th 969, 980.) Under the act, an "aggrieved employee" may bring a civil action personally and on behalf of other current or former employees under "any provision of [the Labor Code] that provides for a civil penalty." (§ 2699, subd. (a).) Of any civil penalties recovered,

12

75 percent goes to the Labor and Workforce Development Agency (the Labor Agency), and 25 percent goes to the aggrieved employees. (§ 2699, subd. (i).) "The purpose of the PAGA is not to recover damages or restitution, but to create a means of 'deputizing' citizens as private attorneys general to enforce the Labor Code." (*Brown v. Ralphs Grocery Co.* (2011) 197 Cal.App.4th 489, 501.)

The legislation authorizes two separate types of penalties. (*Iskanian v. CLS Transportation Los Angeles, LLC* (2014) 59 Cal.4th 348, 378–379.) The first type is the one described above, which are penalties for violating Labor Code provisions that themselves provide for civil penalties, and that were previously recoverable only by the Labor Agency or its related entities. (§ 2699, subd. (a); *Iskanian*, at p. 380.) The second type are penalties for violating Labor Code provisions that do not themselves provide for civil penalties. PAGA creates default penalties for these violations. (§ 2699, subd. (f); *Flowers v. Los Angeles County Metropolitan Transportation Authority* (2015) 243 Cal.App.4th 66, 86 (*Flowers*).)

Both types of penalties are implicated here. The jury found that CSU violated three Cal-OSHA statutory provisions that do not themselves provide for penalties (§§ 6401, 6401.7, subd. (a), & 6403). And it found that CSU violated four Cal-OSHA regulatory provisions that do provide for penalties (Cal. Code Regs., tit. 8, §§ 5208, subds. (k)(1) & (k)(7), 1529, subd. (*l*)(3), & 5142, subd. (b)(1)). The jury also found, however, that Sargent did not personally suffer from any of these regulatory violations. Lastly, the jury found that CSU violated section 232.5, subdivision (a), of the Whistleblower Protection Act, but this provision also does not itself provide for a penalty.

13

b. Analysis.

(1) Sargent was an "aggrieved employee" for one of his PAGA claims.

Appellants first contend that Sargent cannot recover on his PAGA claims because he was not an "aggrieved employee" under PAGA since the jury found that the claims premised on Cal-OSHA were not committed against him personally. Under PAGA, an "aggrieved employee" is defined as "any person who was employed by the alleged violator and against whom one or more of the alleged violations was committed." (§ 2699, subd. (c).) Sargent was such an employee on only one of his PAGA claims (the sole one not based on Cal-OSHA), for impermissibly requiring that he personally refrain from disclosing information about CSU's working conditions as a condition of employment (§ 232.5, subd. (a)).

The Supreme Court recently clarified that "[e]mployees who were subjected to *at least one* unlawful practice have standing to serve as PAGA representatives *even if they did not personally experience each and every alleged violation.*" (*Kim v. Reins International California, Inc.* (2020) 9 Cal.5th 73, 85, italics added.) Sargent alleged and proved that he was subjected to at least one unlawful practice for purposes of PAGA, and he therefore had standing as an aggrieved employee under *Kim* to bring all of his PAGA claims.

(2) CSU is subject to PAGA claims based on violations of Labor Code provisions that themselves provide for penalties.

The parties devote most of their PAGA arguments to whether CSU is a "person" for purposes of the statute, and the California Employment Lawyers Association has filed an amicus curiae brief in support of Sargent's argument that CSU fits the statutory definition. These arguments focus mostly on the word in the abstract and ignore that it is used in PAGA to describe one type

14

of penalty, but not the other.  In our view, the divergent statutory language matters.

We begin our statutory analysis with section 2699, subdivision (a), which does not refer to a "person."  It states that "any provision of this code that provides for a civil penalty to be assessed and collected by the [Labor Agency or related entities] may, as an alternative, be recovered through a civil action brought by an aggrieved employee on behalf of himself or herself and other current or former employees pursuant to the procedures specified in Section 2699.3."  In other words, this provision broadly declares that any employer that is subject to a civil penalty assessed and collected by the Labor Agency is subject to PAGA.  Here, Sargent sought PAGA penalties based on violations of Cal-OSHA, and there is no dispute that CSU is subject to Cal-OSHA.  (§§ 3300, subd. (a) ["employer" means the state and every state agency], 6304 [under Cal-OSHA, "employer" has same meaning as in § 3300].)  Section 2699.3, subdivision (b), sets forth pre-filing requirements for pursuing PAGA claims based on Cal-OSHA, and CSU does not appear to dispute that Sargent complied with those requirements.

Thus, under the plain language of section 2699, subdivision (a), CSU is subject to PAGA claims for violating Cal-OSHA provisions "*that provide[] for a civil penalty*."  (Italics added.)  We reject the notion that CSU, which has long been an employer subject to these penalties in actions brought by the Labor Agency, is somehow not an employer subject to these same penalties in actions brought by aggrieved employees.  In short, CSU is subject to liability under PAGA for claims brought by an aggrieved employee alleging violations of Labor Code provisions that themselves provide for civil penalties.

15

(3) CSU is not a "person" subject to PAGA claims
based on violations of Labor Code provisions
that do not themselves provide for penalties.

While "person" is not referenced in section 2699, subdivision (a), it is used later in the section, but not until subdivision (f). Subdivision (c) defines "aggrieved employee" as "any person who was employed by the alleged *violator*" (italics added), and subdivision (d) explains how an "employer" can "cure" a violation, with no reference to a "person." Subdivision (e) sets forth the discretion the trial court has in assessing penalties, again with no reference to a "person."

Subdivision (f) then sets civil penalties "[f]or all provisions of this code *except those for which a civil penalty is specifically provided*." (Italics added.) It continues: "(1) If, at the time of the alleged violation, *the person* does not employ one or more employees, the civil penalty is five hundred dollars. ($500.) [¶] (2) If, at the time of the alleged violation, *the person* employs one or more employees, the civil penalty is one hundred dollars ($100) for each aggrieved employee per pay period for the initial violation and two hundred dollars ($200) for each aggrieved employee per pay period for each subsequent violation." (Italics added.)[6] Taken together, this language establishes that "a person" who violates a Labor Code provision that does not itself provide for a penalty is liable for the specified default penalty. (§ 2699, subd. (f).)

In deciding whether CSU can be considered such a "person," we look to section 2699, subdivision (b), which provides that "[f]or purposes of this part,

---

[6] The final reference to "person" is in subdivision (h), which provides that an aggrieved employee may not bring an action if "a person" is cited for the same section or sections of the Labor Code under which an employee is attempting to recover. This subdivision is not implicated here.

16

'person' has the same meaning as defined in Section 18." Section 18, in turn, defines "person" as "any person, association, organization, partnership, business trust, limited liability company, or corporation." Appellants contend that CSU does not fit this definition of a person because it is a public entity. (Gov. Code, § 940.6; Ed. Code, §§ 66600, 66601.) We agree. While terms such as "association" or "organization" (§ 18) may generally cover an entity such as CSU, section 18 "contains no words or phrases most commonly used to signify . . . public entities or governmental agencies." (*Wells v. One2One Learning Foundation* (2006) 39 Cal.4th 1164, 1190, 1178–1179 (*Wells*) [public school districts are not "persons" that may be sued under California False Claims Act, Gov. Code, § 12650 et seq.].) "A traditional rule of statutory construction is that, absent express words to the contrary, governmental agencies are not included within the general words of a statute." (*Wells* at p. 1192; see also *California Correctional Peace Officers' Assn. v. State of California* (2010) 188 Cal.App.4th 646, 653 [same, quoting *Wells*]; *Johnson v. Arvin-Edison Water Storage Dist.* (2009) 174 Cal.App.4th 729, 736 [established rule that "public entities are not subject to a general statute unless expressly included"].) Under the holding and rationale of *Wells*, CSU

is not a "person" within the meaning of PAGA, and it is therefore not subject to PAGA's default penalties.[7]

The authority cited by Sargent does not dictate a contrary result. Sargent points out, correctly enough, that the Unruh Act's definition of "person" (Civ. Code, § 51.5, subd. (a)) is similar to PAGA's. But that legislation prohibits discrimination *against* a "person." (*Ibid.*) Those *subject* to the act include any "business establishment of any kind whatsoever" (*ibid.*), which is much broader than the definition of "person." And while *State of California v. Marin Municipal Water Dist.* (1941) 17 Cal.2d 699, 704, held that a county water district was subject to a statue defining "person" as "any person, firm, partnership, association, corporation, organization, or business trust," *Wells* is more recent authority.

In arguing that the University is wholly immune from suit under PAGA, appellants misconstrue legislative history. They first point to an Assembly committee's analysis remarking that the fiscal effect of the bill would be "*[p]otential* increased penalty revenue to the General Fund." (Assem. Com. on Appropriations, Analysis of Sen. Bill No. 796 (2003-2004

---

[7] In light of this ruling, we need not address appellants' separate argument that Sargent could not base his claims on Cal-OSHA's "general duty" provisions (§§ 6401; 6401.7, subd. (a); 6403) on the theory that they cannot be maintained derivatively under PAGA. (See § 6317 [citations where employer "has violated . . . any standard, rule, order, or regulation established pursuant to this part"]; *In re the Appeal of Gray Line Tours* (Sept. 16, 1975, Cal. Dept. Industrial Relations) 1975 WL 23373 [Division of Industrial Safety may not issue citation under § 6401 because it is not a "standard, rule, order, or regulation" under § 6317].) These "general duty" provisions do not carry preexisting civil penalties and thus are not recoverable against CSU, whether or not they are actionable under PAGA against other types of employers.

18

Reg. Sess.) as amended July 16, 2003, p. 2.) (Italics added.) They argue that this means the Legislature did not anticipate *any* negative fiscal effect from penalties being imposed against state agencies, but we disagree. But even if PAGA suits lead to some penalties being collected from state agencies—i.e., penalties for violating Labor Code provisions that themselves provide for penalties—the general fund would likely still realize "potential increased penalty revenue" considering the amounts it would receive collectively from all employers.

Appellants also point to a Senate committee analysis explaining that the state was not collecting all potential penalties from "businesses" that make up the state's underground economy. (Sen. Judiciary Com., Analysis of Sen. Bill No. 796 (2003-2004 Reg. Sess.) as amended April 22, 2003, p. 2.) Appellants suggest that this comment means that the Legislature did not believe that state agencies were violating labor laws. But the same Senate analysis states broadly that the proposed legislation "would allow employees to sue their *employers*," with no limitation on whether the employer was public or private. (*Id.* at p. 1, italics added.)

Finally, we note that while we are aware of no published cases that address whether a public agency is a "person" for purposes of PAGA, employees have successfully sued their public employers under the statute. (*Hawkins v. City of Los Angeles* (2019) 40 Cal.App.5th 384, 387 [affirming award of PAGA penalties against city]; *Flowers*, *supra*, 243 Cal.App.4th at pp. 72, 86 [reversing the sustaining of a demurrer to PAGA cause of action for violations of minimum wage requirements].) It appears that in *Flowers*, plaintiffs sought preexisting penalties. (*Flowers*, at p. 86.)

Having concluded that Sargent was an aggrieved employee because at least one Labor Code violation was committed against him, and having

19

further concluded that CSU is subject to PAGA claims premised on Labor Code provisions that themselves provide for penalties, we turn to how these rules apply in this case. The trial court concluded that Sargent was entitled to recover under PAGA both preexisting civil penalties (§ 2699, subd. (a)) and default penalties (§ 2699, subd. (f)). The court ultimately awarded only default penalties and declined to award any preexisting penalties because "they would be inherently duplicative."

We conclude, however, that the entire award of PAGA penalties must be reversed.[8] PAGA penalties cannot be sustained on Sargent's claims premised on statutory provisions that do not themselves provide for penalties. These include the claims that CSU violated Cal-OSHA by failing (1) to furnish and use safety devices and safeguards (§ 6401), (2) to establish an effective injury-prevention program (§ 6401.7, subd. (a)), and (3) to keep its place of employment safe (§ 6403). They also include the claim that CSU violated section 232.5, subdivision (a), of the Whistleblower Protection Act, the only non-Cal-OSHA statute upon which the PAGA claim was premised.

PAGA penalties also cannot be sustained on Sargent's claims premised on the Cal-OSHA regulations because, even though they provide for penalties, the jury determined that Sargent had not personally suffered from the violations. These include the claims that CSU violated Cal-OSHA by failing (1) to keep all surfaces as free as practicable of asbestos-containing materials (Cal. Code Regs., tit. 8, § 5208, subd. (k)(1)), (2) to properly care for asbestos-containing flooring material (Cal. Code Regs., tit. 8, § 5208, subd. (k)(7)), (3) to comply with proper housekeeping standards with respect to asbestos (*id.*, § 1529, subd. (*l*)(3)), and (4) to inspect and timely repair its

---

[8] In light of this holding, we need not address appellants' argument that the amount of civil penalties awarded exceeded lawful bounds.

20

heating, ventilating, and air conditioning system (*id.*, § 5142, subd. (b)(1)). Although jurors found that one basis for PAGA liability personally affected Sargent, that violation, again, does not provide for a penalty (§ 232.5, subd. (a)).

> *B. Appellants Do Not Identify Any Prejudicial Errors in the Exclusion of Defense Witness Testimony Supporting Their Defense to the Retaliation Causes of Action.*

Appellants do not argue that insufficient evidence supports the jury's verdict on Sargent's retaliation causes of action. They contend, however, that they are entitled to a new trial on these claims because, according to them, the trial court abused its discretion in disallowing certain testimony from two defense witnesses. The contention is without merit.

### 1. Additional Background.

#### a. Tammy Kenber.

Defendants offered the testimony of Tammy Kenber, the associate vice president for human resources at SSU, to explain why the University twice suspended Sargent and implemented a performance-improvement plan for him. Kenber had nearly 30 years of experience in human resources but joined SSU in February 2014, when Sargent already had been placed on an improvement plan. When she started at SSU, Kenber reviewed Sargent's entire personnel file, which at that time spanned over 1,000 pages, and she also met with "the various stakeholders" involved.

On Kenber's first day of testimony, the trial court sustained objections that Kenber was not identified as an expert witness and thus was not permitted to give her opinion on human-resources issues generally or whether she had formed an opinion as to whether Dawson or others had engaged in retaliation against Sargent specifically. As a result of this ruling, when defense counsel asked Kenber what a performance-improvement plan

21

was, the trial court sustained an objection that she was being asked to offer expert opinion on human resources. She also was not permitted to respond to questions about whether she had made a judgment on whether it was appropriate to continue Sargent on his performance-improvement plan, the relationship between an improvement plan and an employee's salary, and whether placing Sargent on the plan was an act of retaliation. She was, however, permitted to testify that she independently had reached a conclusion about the status of Sargent's discipline, and she testified about the steps she personally had taken to make the plan more effective, such as offering money so that Sargent could receive professional training.

The court sustained hearsay objections when Kenber began testifying about what Dawson and another SSU official told her about Sargent's performance. And while she was permitted to testify that Sargent was "abusive and mean spirited and counterproductive, and insubordinate," she was not permitted to testify whether those factors affected her assessment of whether the disciplinary actions against him were appropriate. The trial court also sustained objections to testimony about whether Sargent's improvement plan was effective, what generally makes improvement plans effective, and whether Microsoft Outlook is an effective time-management tool. Kenber testified without objection that she was part of the team that made the decision to place Sargent on suspension. But the trial court sustained hearsay objections to testimony over whether documents in Sargent's personnel file supported his discipline.

After the jury had been dismissed after Kenber's first day of testimony, the parties and the trial court discussed Sargent's objections and the trial court's rulings. At one point the court asked defense counsel about "the strict liability issue" that had been raised at an unreported sidebar. Defense

22

counsel argued that Dawson made disciplinary decisions with human resources and that whether his decisions were consistent with University policy "goes to inform Ms. Kenber's judgment that this was not retaliatory." The court observed that this was "a pretty significantly expanded argument from what [it] heard at sidebar," but that the court's rulings would stand. Sargent's counsel responded, in full, that "[t]he law provides for strict []liability for any retaliatory animus by any of the defendants' supervisors. And so it is irrelevant whether Ms. Kenber herself was innocent as, you know, unwittingly cooperated with Mr. Dawson's retaliation."

Before Kenber's second day of testimony, appellants filed a motion seeking to overcome Sargent's objections. They argued that Kenber's testimony was offered to explain that the University's actions were taken for legitimate, nondiscriminatory reasons, and that the information she relied on was admissible regardless of its truth. The motion quoted the argument by Sargent's counsel that it was irrelevant whether Kenber had "unwittingly cooperated" with any retaliation by Dawson. Appellants argued that Sargent appeared to be advancing a "cat's paw" theory that it is irrelevant whether a decision maker feels retaliatory animus toward a plaintiff where the purpose and effect of the involvement was merely to effectuate the will of a retaliating supervisor. They contended that Kenber's testimony was in fact relevant because it would show that Kenber's actions were "untainted by Mr. Dawson's alleged bias" and were taken for a legitimate purpose. And they submitted a declaration from Kenber stating that (1) from the date she started her position in February 2014 through the date of Sargent's resignation, she was responsible for approving any performance-improvement plans and suspensions served on Sargent, (2) when she started her position she investigated the basis for Sargent's existing improvement plan to

23

determine whether there was a non-retaliatory basis for the plan and determined that there was such a basis in the record, (3) she reviewed the record to determine whether Sargent had complied with the improvement plan and determined that he had not, (4) she participated in discussions regarding whether to extend the improvement plan and ultimately approved the decision to do so, (5) she also decided to put into place both of the suspensions that ultimately were served on Sargent, (6) she determined that the suspensions were appropriate after reviewing information both from Dawson and Sargent, (7) she also determined that Sargent had failed to comply with the University's performance standards, which supported both his suspensions, and (8) she took steps to ensure the University was not basing its decision to suspend Sargent on any prohibited basis, "including reviewing the record of Mr. Sargent's own communications, and determined that the evidence provided by Mr. Sargent itself demonstrated that in some instances he did not contest the demonstrated performance deficiencies and that he had failed to adhere to the University's performance standards." The trial court received the motion shortly before the resumption of testimony and thus did not have the opportunity to rule on it before Kenber resumed testifying.

Kenber testified on her second day about steps she personally took in June 2014 to amend Sargent's performance-improvement plan to help him improve. The trial court again sustained objections to questions about the conclusions Kenber reached after interviewing people who worked with Sargent. She was permitted to testify that her discussions with others led her to conclude that the extension of Sargent's improvement plan was appropriate, but she was not permitted to testify as to what, specifically, she had learned from people other than Dawson. And although Kenber testified

24

that she supported Sargent's first suspension and recommended it to the president of the University, she was not permitted to testify whether the improvement plan had been successful. The trial court sustained several additional hearsay and improper-opinion objections before cross-examination began the morning of that second day of Kenber's testimony. She was, however, permitted to testify that she was "[o]f course not" retaliating against Sargent in authorizing his suspension, and that suspending an employee is "really a last resort." Kenber also testified that she reviewed emails from Sargent showing his lack of professional and respectful communication, which supported her decision to institute the second suspension.

### b. Stephen Green.

Appellants also offered the testimony Stephen Green, the director of labor and employer relations at SSU. According to his declaration filed after he testified, Green was prepared to testify that the DOSH inspector who responded to Sargent's complaints about asbestos at Stevenson Hall requested a meeting with the University's human resources team to address concerns about Sargent. Specifically, Green was prepared to testify that the inspector was critical of Sargent's communications to the campus community because he (Sargent) caused distrust of both SSU and DOSH, and he needlessly created "an environment of fear." During his meeting with University personnel, the inspector raised concerns that Sargent was "weaponiz[ing]" DOSH "to further infighting between Mr. Sargent's union and management." Green was further prepared to testify that the inspector considered Sargent's complaints to DOSH about asbestos to be "harassing such that, if the agency received any further such complaints [DOSH] would not respond." The inspector died before trial.

25

Green was not permitted to testify at trial about the inspector's statements. He did testify that in 2012 he received Sargent's grievance about the leaf-blowing incident. Green met with Dawson and also attended grievance meetings. At one of those meetings, Sargent said that instead of notifying anyone on campus about his concerns about lead in the debris, he conducted tests and mailed them to a testing lab with instructions to return the results. The results arrived on a day Sargent was not scheduled to be on campus, so there was a delay in addressing the issue. Green testified that although Sargent said he was concerned about the lead, "he did nothing about that concern for 4 or 5 days and didn't allow anybody else—he didn't share that concern with anybody else to allow them to do anything about it."

Green also testified that he, Dawson, and the University's risk manager discussed preparing a counseling memorandum to notify Sargent about concerns with his performance. They wanted Sargent to recognize that it was important to communicate his safety concerns first with his department so it had the chance to take appropriate action. Green was permitted to testify about why certain provisions were included in the counseling memorandum, but he was not permitted to testify about whether he was concerned that the memorandum might be retaliatory. Green also was questioned about his role in issuing Sargent a written reprimand in March 2013, four reprimands in May 2013, and a reprimand in June 2013, and whether he personally thought the reprimands were appropriate. He also was permitted to testify that an email exchange between Sargent and Dawson supported the decision to issue Sargent a written reprimand. Green further testified about the performance-improvement plan implemented for Sargent and why he (Green) felt it was appropriate.

c.  The Trial Court's Rulings.

At a hearing held after Kenber's testimony and during a break in Green's testimony, appellants argued that both witnesses should be permitted to testify about information made available to them not for the truth, but to show that the decisions they made were not done for retaliatory reasons.  The trial court distinguished appellants' questioning of Kenber from that of Green.  Whereas Kenber was asked about "the psychological intent of other parties," which the court considered to be an inappropriate area for questioning, Green had been asked about "the actual statements of written reprimands" and whether he agreed with them.  The court stated that witnesses were not permitted to "come in and say, I tested the motives of the other people involved in this case and found them to be sound," which would be "unduly prejudicial, at the very least," and improper on other grounds as well.

When appellants' counsel resumed questioning Green the following day, Sargent's counsel again objected when Green was questioned about the basis for his conclusion that it was appropriate to institute a performance-improvement plan for Sargent.  Outside the presence of the jury, the trial court stated that it was appropriate for Green to testify about his personal involvement in the performance-improvement plan, what he relied on in drafting the plan, and why he concluded it was appropriate.  And the court told Green that he could testify that he talked to others and relied on what they said, but he could not testify what others said until he was specifically asked to state that information.  Green continued to testify about his personal involvement in employment actions involving Sargent, though the court did sustain some objections to questions about whether Green believed those actions were appropriate.

d.  Post-testimony Motion to Strike.

Following the testimonies of Kenber and Green, Sargent filed a motion to strike certain excerpts that he argued amounted to improper opinion by lay witnesses.  Appellants opposed the motion.  The trial court granted the motion.  The court concluded that Kenber's or Green's opinions about Dawson's motives or whether Dawson's request for assistance was appropriate were irrelevant to whether Dawson acted with retaliatory animus.  The court further noted that neither Kenber nor Green were identified as witnesses who would offer expert testimony, and it emphasized that they did not have knowledge of the facts underlying Dawson's request for discipline.  The court stated that appellants conflated an "an independent factual basis for discipline with a separate opinion regarding the factual basis for the discipline."  Kenber and Green testified they believed grounds for termination existed based on their review of documents and information provided by Dawson—reasons already advanced by Dawson.  The court stressed that appellants had "both explained what they did and produced evidence in support of their contention that [Sargent] was fired for insubordination and failing to perform the responsibilities of his job."

e.  Jury Instruction and Verdict.

The jury was instructed under CACI No. 2511 (Adverse Action Made by Decision Maker Without Animus (Cat's Paw)) that Sargent had alleged that a variety of individuals had decided to take adverse employment action against him.  Under the instruction, even if any of those individuals did not hold any retaliatory intent or were unaware of Sargent's protected activities, CSU could still be liable for retaliation if Sargent proved both that (1) his protected activity was a substantial motivating reason for a supervisor's recommendation to take adverse employment action against him and (2) the

28

supervisor's recommendation to take adverse employment action against him was a substantial motivating reason for the decision to take adverse employment action against him.

The jury found in Sargent's favor and concluded that he engaged in protected activity, that Dawson constructively discharged him or took other adverse employment action against them, and that Sargent's protected activity was a contributing factor in Dawson's decision to take that adverse action.

### 2. Analysis.

Appellants argue that the trial court abused its discretion in several respects in excluding the proffered testimony, but we disagree. (*People v. Guerra* (2006) 37 Cal.4th 1067, 1113 ["The abuse of discretion standard of review applies to any ruling by a trial court on the admissibility of evidence"].)

### a. Appellants Do Not Identify any Testimony That Was Improperly Excluded on Hearsay Grounds.

Appellants first contend that it was "clear error" for the trial court to exclude portions of Kenber's and Green's testimonies on hearsay grounds because contents of Sargent's personnel file "or other investigation were not offered for the truth of the matter but for the effect of such information on Ms. Kenber and Mr. Green." Even assuming that appellants preserved this argument for all of the excerpts they point to on appeal, we reject it.

Although appellants quote several excerpts from Kenber's and Green's testimonies in the facts section of their opening brief, they use only two examples in their argument section claiming error based on improperly excluded nonhearsay. (*City of Lincoln v. Barringer* (2002) 102 Cal.App.4th 1211, 1239, fn. 16 [record citations in factual background portion of brief do

not cure failure to include relevant record citations in argument].)
Appellants first point to an exchange where Kenber was asked what she did
to determine whether any disciplinary actions had been taken against
Sargent when she became director of human resources, and she responded, "I
read everything about the Performance Improvement Plan, I met with
Mr. Dawson and [the associate vice-president for facilities operations and
planning]. They were desperate for Mr. Sargent to improve." The trial court
sustained a hearsay objection. And it sustained a motion to strike improper
opinion testimony when Kenber then testified that she "met with everyone
and looked at all the documentation to make sure that it was backed up."
Later, Kenber was permitted to testify that she was part of the team that
made the decision to suspend Sargent. But the trial court then overruled an
objection to a question about what Kenber did to determine whether the
suspension was appropriate and told Kenber she was being asked "not for
your opinions, but for what you specifically did at that time." But when
Kenber testified that she "reviewed all the documentation that backed up
Mr. Sargent's behavior," the court sustained an objection that it was
improper opinion whether the documentation "backed up" the decision. And
the court further sustained an improper-opinion objection during Kenber's
testimony that she "spoke with the management team and got firsthand
information about things that had happened and I had my own opinions from
reading through Mr. Sargent's file that we were still dealing— ." Counsel did
not say that this testimony was being offered for a nonhearsay purpose and
instead asked a question about whether Kenber had spoken with Sargent.

On appeal, appellants contend that this case is similar to *Means v.
City & County of San Francisco* (N.D. Cal. 2010) 749 F.Supp.2d 998, 1009
(*Means*), where a federal district court granted summary judgment on a

plaintiff's racial discrimination claims against her employer, a public hospital. The plaintiff's supervisor was permitted to submit a declaration stating that the plaintiff made a series of inappropriate sexual comments to patients at the hospital because the evidence was being offered not for its truth but for its impact on the decision maker, the declaration was based on the supervisor's personal knowledge of the third parties' complaints, and it was based on the supervisor's investigation. (*Id.* at pp. 1002, 1005, fn. 2.) Here, by contrast, Kenber did not conduct her own investigation but was asked instead about the contents of Sargent's personnel file. And in any event the testimony and questions appellants point to apparently were offered for their truth—i.e., whether the decision to discipline Sargent was "backed up" and the fact that Sargent's superiors were "desperate" for him to improve.

Appellants next argue that Green's proffered testimony about a DOSH inspector's complaints about Sargent likewise was properly offered for a nonhearsay purpose. According to Green's declaration, he was prepared to testify that the inspector's concerns about "the harassing nature" of Sargent's complaints to DOSH informed Green's decision to place Sargent on a performance-improvement plan because the inspector's concerns informed Green that "Sargent was communicating in an unprofessional way not only within the University, but to outside organizations as well." This declaration is phrased in terms of offering testimony about the truth of the inspector's statement. True, the written proffer compared Green's proposed testimony to the declaration offered in *Means* for the nonhearsay purpose of its impact on the decision-maker. (*Means, supra*, 749 F.Supp.2d at p. 1005, fn. 3.) But that same proffer stated that the testimony was offered to show that Sargent

31

communicated in an unprofessional way—again, for what is phrased as a nonhearsay purpose.

Even assuming that the trial court should have allowed Green to testify about the inspector's statement, this would not amount to reversible error. Multiple witnesses testified about concerns with Sargent's performance and communication skills, and the jury nonetheless found that SSU had retaliated against him.

>    b.  Appellants Do Not Cite Any Examples of Testimony
>        Improperly Excluded as Opinion.

In a single paragraph that includes no citations to the record, appellants argue that neither Kenber nor Green offered improper opinion testimony. We need not address this undeveloped argument. (*Nwosu v. Uba* (2004) 122 Cal.App.4th 1229, 1246 [court may treat as waived arguments that lack citations to the record].)

>    c.  The Trial Court Did Not Misapply the "Cat's Paw"
>        Doctrine.

Finally, appellants contend that the trial court misapplied the "cat's paw" doctrine, but they are mistaken. As the jury was instructed, if an employer acts as the conduit of a supervisor's prejudice ("his [or her] cat's-paw") that supervisor's animus may be imputed to the employer even if other decision makers were unaware of the supervisor's motive. (*Reeves v. Safeway Stores, Inc.* (2004) 121 Cal.App.4th 95, 114 (*Reeves*), italics omitted.)[9] "[I]gnorance of an occasion for retaliation can only constitute a defense as to those actors who were in fact ignorant of the plaintiff's protected activities. . . . [I]t is not enough to show that one actor acted for lawful

---

[9] The term "cat's paw" apparently has two origins, one of which is traced to Aesop and the other to a type of carpenter's tool. (*Reeves*, *supra*, 121 Cal.App.4th at p. 114, fn. 14.)

reasons when that actor may be found to have operated as a mere instrumentality or conduit for others who acted out of discriminatory or retaliatory animus, and whose actions were a but-for cause of the challenged employment action. If a supervisor makes another his tool for carrying out a discriminatory action, the original actor's purpose will be imputed to the tool, or through the tool to their common employer." (*Id.* at p. 113.)

Appellants do not suggest that the record lacks substantial evidence that Dawson acted with retaliatory motive. But they apparently contend that they were prevented from demonstrating that Dawson's animus was not the substantial motivating factor in taking adverse employment actions against Sargent. Under this theory, Kenber and Green "br[oke] the chain of causation by taking a truly independent action." (*Reeves, supra,* 121 Cal.App.4th at p. 114, fn. 14.) The problem with this argument is that it does not matter how pure their motives were or how ignorant they were of Dawson's intent. That is because it is undisputed that Dawson was Sargent's supervisor. And appellants do not challenge the jury's findings that Dawson constructively discharged Sargent or took other adverse employment action against him; that Sargent's protected activity was a contributing factor in Dawson's decision to take the adverse employment action; that Dawson's conduct was a substantial factor in causing Sargent harm; and that Dawson did not prove that the actions he took would have occurred for legitimate, independent reasons even if Sargent had not engaged in protected activity. True, the jury made those same findings with respect to CSU as a whole. Again, though, because Dawson was part of CSU's decision-making process, it does not matter whether other decision-makers acted without knowledge of Dawson's improper motives. (*Reeves, supra,* 121 Cal.App.4th at p. 117 [whatever the role of one person in possible supervisory position, there was

"ample basis for finding retaliatory motives and conduct on the part of plaintiff's unquestioned supervisor"]; *Campbell v. Regents of University of California* (2005) 35 Cal.4th 311, 329 [employer responsible for acts of its managers under § 1104].)

The trial court did not abuse its discretion in excluding the testimonies of Kenber and Green, and even if it had abused its discretion, it is not reasonably probable that a result more favorable to appellants would have been reached.

C. *The Trial Court Did Not Abuse Its Discretion in Awarding Sargent Attorney Fees.*

1. Additional Background.

As we have said, the trial court awarded attorney fees to Sargent. In its order, the court recounted how the case had been "intensely litigated": the docket ran 167 pages; there were numerous discovery disputes; a three-day evidentiary hearing was held after Sargent brought a motion for sanctions for spoilation of evidence, and although sanctions were not awarded on that motion, the court ordered appellants to pay $3,330 in connection with a separate discovery motion. Trial proceedings likewise were "aggressively litigated," with numerous motions filed before and during trial involving "serious, substantive legal issues." And there were many "complex and . . . novel" issues in the case, some of which (as confirmed above) were matters of first impression. The court further noted that appellants devoted far more

attorney time (more than 13,000 billable hours)[10] to the case even though Sargent had the burden of proof, and appellants had two to three defense attorneys (and possibly more) for each lawyer representing Sargent.

The trial court concluded that three legal bases supported the fees award: (1) PAGA itself, which authorizes a fee award to a prevailing employee (§ 2699, subd. (g)(1)), (2) Code of Civil Procedure section 1021.5, which authorizes a fees award when an action results in the enforcement of an important right affecting the public interest; and (3) the "catalyst doctrine." The court further concluded that it was neither necessary nor possible to apportion the fees among the retaliation and PAGA causes of action.

As for the amount of the award, the trial court concluded that the lodestar amount Sargent requested, $3,934,959.50, was reasonable. The lodestar was reached "by multiplying the number of hours spent by the attorneys by an hourly rate that is reasonable under the circumstances." (*Northwest Energetic Services, LLC v. California Franchise Tax Bd.* (2008) 159 Cal.App.4th 841, 879 (*Northwest*).) On appeal, appellants do not challenge the number of hours Sargent's attorneys spent on the litigation or the attorneys' hourly rates.

Sargent requested a 3.0 multiplier, while appellants argued that the court should not award a multiplier greater than 1.65. The trial court ultimately selected a multiplier of 2.0 for the fees of three of Sargent's five

---

[10] This portion of the trial court's order states that defense counsel's 13,020 hours compared to 4,420.1 hours billed by Sargent's attorneys. Appellants now contend this was "an apparent miscalculation" because Sargent's counsel in fact billed 8,855.81 hours. That latter, correct, figure was used by the trial court in the section of the award that calculated the total lodestar amount, an indication the trial court was aware of the true figure.

attorneys after considering the novelty and difficulty of the questions involved, the skill displayed in presenting them, the extent to which the litigation precluded other employment, the contingent nature of the fee award, and the fact an award against the state would ultimately fall on the taxpayers. The total fee awarded (including the amount to pursue the fees motion) was $7,793,030.

Appellants contend that, even if we affirm Sargent's retaliation causes of action, we must vacate the entire award of attorney fees if we conclude there is no liability under PAGA. They are mistaken.

### 2. Sargent Was Entitled to Fees Under Code of Civil Procedure section 1021.5.

We agree with the trial court that the fees award was proper under Code of Civil Procedure section 1021.5, and in doing so we reject appellants' argument that Sargent's claims vindicated only a private, and not a public, interest.

Code of Civil Procedure section 1021.5 authorizes a court to award attorney fees to a successful party in an action that results in the enforcement of an important right affecting the public interest if (1) a significant benefit has been conferred on the general public or a large class of people, (2) the necessity and financial burden of private enforcement make the award appropriate, and (3) such fees should not in the interest of justice be paid out of any recovery. Appellants challenge the first two of these elements. The statute codifies "the 'private attorney general' doctrine of attorney fees articulated in *Serrano v. Priest* (1977) 20 Cal.3d 25 and other judicial decisions. (*Flannery v. California Highway Patrol* (1998) 61 Cal.App.4th 629, 634 (*Flannery*).) "Underlying the private attorney general doctrine is the recognition that privately initiated lawsuits often are

36

essential to effectuate fundamental public policies embodied in constitutional or statutory provisions, and that without some mechanism authorizing a fee award, such private actions often will as a practical matter be infeasible. The basic objective of the doctrine is to encourage suits enforcing important public policies by providing substantial attorney fees to successful litigants in such cases." (*Ibid.*)

Because the doctrine is meant to enforce important public policies, "[w]hen the record indicates that the primary effect of a lawsuit was to advance or vindicate a plaintiff's personal economic interests, an award of fees under [Code of Civil Procedure] section 1021.5 is improper." (*Flannery, supra*, 61 Cal.App.4th at p. 635 [plaintiff who prevailed in FEHA action not entitled to attorney fees under Code Civ. Proc., § 1021.5].) "Because the public always has a significant interest in seeing that laws are enforced, it always derives some benefit when illegal private or public conduct is rectified. Nevertheless, the Legislature did not intend to authorize an award of fees under [Code of Civil Procedure] section 1021.5 in every lawsuit enforcing a constitutional or statutory right." (*Flannery,* at p. 635.) We review the decision to award fees under the statute for an abuse of discretion. (*Id.* at p. 634.)

Appellants contend that the award of fees under the public-benefit theory was "legal error" because the trial court based its decision to award fees on the public interest advanced by Sargent's PAGA claims and not his individual employment claims. They argue that this case is similar to *Flannery*, where this court concluded that a plaintiff who prevailed on her FEHA causes of action for sexual discrimination and sexual harassment was entitled to her attorney fees under FEHA but not under Code of Civil Procedure section 1021.5 because the primary effect of her lawsuit was to

37

vindicate her own personal right and economic interest. (*Flannery*, *supra*, 61 Cal.App.4th at pp. 637–638.) But here, the case was a whistleblower action and, as the trial court observed in awarding fees, Sargent vindicated the fundamental rights of CSU employees to be protected from retaliation when they report what they reasonably believe to be unlawful conduct and share information about unsafe working conditions. (See *Hawkins v. City of Los Angeles*, *supra*, 40 Cal.App.5th at pp. 397–398 [plaintiff in whistleblower action entitled to fees under Code. Civ. Proc. § 1021.5 because action revealed that city had been pressuring hearing examiners to change decisions on parking-ticket disputes]; *Jaramillo v. County of Orange* (2011) 200 Cal.App.4th 811, 829 [Code. Civ. Proc., § 1021.5 authorized fees to plaintiff whose action "lessen[ed] the probabilities of abuse and corruption in the sheriff's office"].) Sargent's retaliation causes of action advanced the ability of CSU employees to report violations of the law affecting CSU campuses.

As for the necessity and financial burden of private enforcement, appellants again fault the trial court for "erroneously rel[ying] on [Sargent's] PAGA case to justify attorneys' fees for the retaliation claims" and "fail[ing] to parse which of [the many hours spent litigating the case] were incurred litigating his PAGA claims." But the court specifically found that apportionment was not reasonably practical, and appellants do not contend otherwise. They claim that without the PAGA causes of action, this case was no longer complex and did not involve issues of first impression or statutory construction. The court found, however, that Sargent "persuasively demonstrated that the issues involved in the two claims were 'inextricably intertwined' and [he] would have undertaken to prove the underlying OSHA violations in order to bolster the retaliation claims, even if the PAGA cause of

action had never been brought." In other words, the court was saying it was appropriate to consider the Cal-OSHA claims for purposes of awarding attorney fees under Code of Civil Procedure section 1021.5 because Sargent had to prove them in order to recover on his retaliation causes of action.

We also reject appellants' argument that the award of attorney fees must be vacated if the PAGA penalties are not affirmed. Appellants rely on *Ventas Finance I, LLC v. Franchise Tax Bd.* (2008) 165 Cal.App.4th 1207, 1322, in which this court concluded that the trial court erred in awarding a company a full refund of taxes it paid and remanded so that the trial court could use a proper measure of apportionment in issuing a refund. This court also reversed the attorney fees awarded under Code of Civil Procedure section 1021.5 because it "[could not] say with certainty that the [trial] court would [have] exercise[d] its discretion the same way had [the plaintiff] not prevailed on its contention that it was entitled to a full refund." (*Ventas*, at pp. 1233–1234.) Here, by contrast, the trial court could not have been clearer that it would have awarded the same amount in attorney fees even if Sargent had not recovered on his PAGA claims. It stated, "Even if [Sargent] had not succeeded on the PAGA/OSHA portion of the Judgement . . . , this Court *would still find* that [Sargent] still meets the 'public benefit' element of a fee award under Section 1021.5 . . . , as a result of [Sargent's] success on three whistleblower claims." (Italics added.)

Furthermore, although we cannot sustain the award of PAGA penalties, nothing in our ruling negates the trial court's findings that Sargent's lawsuit "vindicated [Sargent's] health and safety concerns, exposed OSHA violations [appellants] had engaged in for years, . . . prompted radical change in health and safety practices at Sonoma State University and beyond," and "compel[led appellants] to adequately inspect suspected

39

hazardous conditions, test for any threats posed by hazardous materials like asbestos, notify employees of any hazards thus found, and to utilize appropriate protective equipment, training, and practices to ensure the work environment was safe."[11]

In light of our ruling that the fees award was proper under Code of Civil Procedure section 1021.5 under a public-benefit theory, we need not consider the parties' arguments over whether it was appropriate under the catalyst theory.

### 3. The Trial Court Did Not Abuse Its Discretion in Applying a Multiplier.

Finally, appellants argue that we should strike the 2.0 multiplier, but they have not shown that the trial court abused its discretion in awarding it. Once the lodestar is determined, the trial court "may then adjust [it] upward or downward, depending on the circumstances of the litigation and counsel's representation, such as the following: the novelty and difficulty of the questions involved and the skill displayed in presenting them; the extent to which the nature of the litigation precluded other employment by the attorneys; the contingent nature of the fee award; whether the award would be against the state and ultimately fall upon the taxpayers; whether the attorneys received public and charitable funding for the purpose of bringing lawsuits of the same character; and whether monies awarded would inure not to the individual benefit of the attorneys involved but to the organizations by

---

[11] It is also worth pointing out that we are publishing our PAGA holdings, and "an appellate court is in at least as good a position as the trial court to judge whether the legal right enforced through its own opinion vindicates an important public interest and confers a significant benefit on the general public or a broad class of citizens." (*Bouvia v. County of Los Angeles* (1987) 195 Cal.App.3d 1075, 1083, fn. 7; see also *Los Angeles Police Protective League v. City of Los Angeles* (1986) 188 Cal.App.3d 1, 7–9.)

which they are employed. [Citation.] This is an illustrative rather than exclusive list of potentially relevant factors." (*Northwest, supra*, 159 Cal.App.4th at pp. 879–880.) We review the calculation of attorney fees for an abuse of discretion. (*Id.* at p. 879.)

Appellants focus on the fact the award will fall on the taxpayers and be paid to private attorneys. They accuse the trial court of relying on legal authority that gave "short shrift" to the appropriateness of weighing whether an award "fall[s] upon the taxpayers." (*Serrano v. Priest, supra*, 20 Cal.3d at p. 49.) While we agree that courts should not thoughtlessly impose a fee multiplier against a public entity, the court here did no such thing. It acknowledged *Serrano* and other authority addressing whether an enhanced fee would "ultimately fall upon the shoulders of California taxpayers." (*In re Lugo* (2008) 164 Cal.App.4th 1522, 1546 [upholding multiplier of 1.5].) At the same time, it acknowledged authority that cautioned against denying a multiplier based solely on a defendant's status as a public entity—including CSU. (*Rogel v. Lynwood Redevelopment Agency* (2011) 194 Cal.App.4th 1319, 1332 ["strong public policy" against awarding less than fair market value of attorney fees "merely because the case was filed against a government agency"]; *Horsford v. Board of Trustees of California State University* (2005) 132 Cal.App.4th 359, 400–401 [abuse of discretion to deny enhancement multiplier where plaintiff proved intentional discrimination and defendant engaged in "lengthy and complex litigation"]; *Citizens Against Rent Control v. City of Berkeley* (1986) 181 Cal.App.3d 213, 235 [trial court's refusal to reduce lodestar figure because defendant was public entity did not amount to abuse of discretion in light of other factors].)

Appellants quibble with other portions of the trial court's order, arguing that the court failed to compare accurately the attorney hours spent

41

by both sides' attorneys (*ante*, fn. 10) and that a fee may not be enhanced to punish a party (something that did not happen here).  But they fall short of establishing that the court abused its discretion in applying the 2.0 multiplier.

Appellants argue that this case is similar to *Northwest*, *supra*, 159 Cal.App.4th 841, but we disagree.  There, the trial court simply listed relevant factors without elaboration when awarding attorney fees that amounted to *16 times* the lodestar figure.  (*Id.* at pp. 879–880, 882.)  The appellate court concluded that "the listing of th[o]se factors d[id] not provide a persuasive justification of adjusting the lodestar upward" in the absence of further explanation and based on the record.  (*Id.* at p. 880.)  Here, by contrast, the trial court offered a detailed explanation of the award of attorney fees in general, and of the decision to apply a multiplier in particular.  The court addressed the novelty and difficulty of the questions presented, the skill displayed in presenting them, and the extent to which the nature of the litigation precluded other employment.  We cannot say under the circumstances that the award of attorney fees amounted to an abuse of discretion.

III.
DISPOSITION

In A153072, the judgment is affirmed in part and reversed in part.  The case is remanded to the trial court with directions to strike from the judgment the penalties awarded under PAGA.

In A154926, the award of attorney fees is affirmed.

Each side shall bear its own costs of appeal.

_____

Humes, P.J.


WE CONCUR:



_____

Margulies, J.



_____

Banke, J.




*Sargent v. Board of Trustees*  A154926/A153072


43

Trial Court:

Superior Court of the County of Sonoma


Trial Judge:

Hon. Nancy Case Shaffer


Counsel for Defendants and Appellants:

Daralyn J. Durie, David McGowan, Andrew L. Perito, Durie Tangri LLP

William C. Hsu, California State University Office of General Counsel


Counsel for Plaintiff and Respondent:

Norman Pine, Scott Tillett, Chaya M. Citron, Pine Tillett Pine LLP

Dustin L. Collier, V. Joshua Socks, Collier Law Firm LLP

Valinda Kyrias, Law Offices of Valinda Kyras


*Sargent v. Board of Trustees* A154926/A153072